HUNT et al., Appellants,

v.

**WESTLAKE CITY SCHOOL DISTRICT et al., Appellees.**

[Cite as *Hunt v. Westlake City School Dist.* (1995), 100 Ohio App.3d 233.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 66592.

Decided Jan. 10, 1995.

234

*Randall Vehar* and *Ronald G. Macala,* for appellants.

*Rosenzweig, Schulz & Gillombardo Co., L.P.A.,* and *William J. Gagliano,* for appellees.

WEAVER, Judge.

Plaintiffs Frances Hunt and the Westlake Teachers' Association appeal from the order of the trial court which awarded summary judgment to defendants Westlake City School District Board of Education ("board") and David J. Karahuta in plaintiffs' action for discriminatory and unconstitutional employment practices, and which dismissed plaintiffs' remaining causes of action. For the reasons set forth below, we reverse.

## I

The record reveals that in August 1990, the board voted to employ plaintiff Hunt as a long-term substitute teacher at Bassett Elementary School for the first semester of the 1990–1991 school year. Thereafter, in December 1990, the board again voted to employ Hunt as a long-term substitute teacher for the second semester of the 1990–1991 school year. In August 1991, Hunt was informed that her employment would not be renewed for the 1991–1992 school year. Hunt filed grievances with the board and the board responded by offering Hunt the opportunity to substitute teach on a casual or as-needed basis. Hunt apparently agreed to this offer, but was never called to substitute teach.

On March 18, 1992, Hunt and the Westlake Teachers' Association ("WTA") filed this action against the board and Bassett Elementary School Principal David Karahuta. In their second amended complaint, plaintiffs alleged that as a long-term substitute teacher at the school district, Hunt was entitled to notice of nonrenewal by April 30, 1991, and that absent timely notice, her employment would have "rolled over" or continued for the 1991–1992 school year. In addition, plaintiffs alleged that defendants represented that Hunt's employment would be renewed, but subsequently elected not to renew her employment because she contemplated becoming pregnant in the near future and because she attempted to pursue the reporting of suspected child abuse. Plaintiffs then set forth causes of action for breach of employment contract (including promissory estoppel and public policy claims), violation of constitutional rights under Section 1983, sexual discrimination under to R.C. 4112.02, and defamation. Later, plaintiffs set forth a fifth cause of action that alleged that defendants had violated the state "Sunshine" law in connection with the procedure by which they had reached the decision not to renew Hunt's employment.

Defendants denied liability under all of the causes of action advanced by plaintiffs, and subsequently moved for summary judgment. On June 6, 1993, the trial court entered summary judgment for defendants as to plaintiffs' Section 1983 claim, sexual discrimination claim, and defamation claim.

Thereafter, the matter proceeded to a bench trial on plaintiffs' remaining claims for breach of contract, promissory estoppel, and violation of the "Sunshine" law.

As trial commenced, the parties stipulated, *inter alia*, that Hunt's employment was not excluded from representation under the collective bargaining agreement, that Hunt's prior employment was as a long-term substitute teacher and not a casual substitute teacher, that Hunt did not receive classroom visitations or observations during this prior employment, that the board did not document any professional deficiencies in Hunt's teaching, that Hunt was not notified twenty days in advance of the board's meeting at which the board decided not to renew her employment, and that the school system utilized eighty-four casual substitute teachers for a total of 890.5 school days, and they were paid $49 per day.

Plaintiffs then presented the testimony of Christina Dinklocker as if upon cross-examination, Patrick Walsh, and Frances Hunt.

Christina Dinklocker testified that she was assistant superintendent of the school district in 1990 when Hunt was first hired as a long-term substitute on a limited, one-semester contract. After forty days, long-term substitute teachers are paid in accordance with the board's pre-set salary schedule and are given benefits. Conversely, casual substitute teachers are paid a flat rate of $49 per day, or $75 per day after the first ten days, with no benefits. Dinklocker further testified that Hunt was a certificated employee with less than three years' teaching experience. Teachers who have limited contracts must be given notice of nonrenewal by April 30, in order to prevent the contract from automatically "rolling over" to another year.

Dinklocker further testified that after conducting an investigation into this matter, she learned that Hunt was not given proper advance notice of the board's decision not to renew her contract, and was not given the observations and evaluations provided for in the collective bargaining agreement. Hunt's complaints were subsequently presented to the board in executive session. Dinklocker admitted, however, that at this "hearing," Hunt simply presented her point of view, and there were no questions asked of her, no discussions by the board, and no formal decision afterward. Thereafter, on August 12, 1991, Dinklocker, in her position as acting superintendent of the school district, sent Hunt a letter, which proposed that Hunt receive casual or as-needed substitute teaching assignments in resolution of the matter.

Patrick Walsh testified that he is President of the Westlake Teachers' Association, and was chief negotiator for the association in the collective bargaining process that preceded adoption of the collective bargaining agreement in effect from 1989 through 1991. According to Walsh, teachers with less than three years' experience with the board were not obligated to arbitrate disputes

concerning nonrenewal, but could instead pursue other avenues of dispute resolution.

On cross-examination, Walsh admitted that a teacher's employment may be nonrenewed without cause. With regard to plaintiffs' promissory estoppel claim, Walsh indicated that only the board, by vote taken at a public meeting, may hire a teacher. Individual board members and the principal acting alone have no authority to do so.

Frances Hunt testified that she graduated from Muskingham College in 1990. She was ranked as first in her class in education and also had a 4.0 grade point average in her major. Her first teaching job was with the board, at Bassett Elementary School. According to Hunt, she interviewed for the position and submitted letters of recommendation, then was contacted by former Superintendent Dr. Mary Spor, who guaranteed that Hunt would have a position at the school system for the 1990–1991 school year, and thereafter. Hunt further testified that in February 1991, Karahuta told her that another second grade teacher was retiring and that she would replace her in that permanent position. Hunt then accepted the position, and Karahuta later gave her the class list and allowed her to order supplies for the 1991–1992 school year. In addition, Hunt prepared a grant request for a language curriculum at Bassett for the 1991–1992 school year.

Hunt later learned that the board had decided to nonrenew all of the long-term substitutes whom it had hired during the preceding year, but Karahuta and board member Keith Estes assured her that she would be hired as a regular full-time teacher. Hunt participated in formal interviews for this position and was then hired as the advisor to the 1991 varsity soccer cheerleading squad. According to Hunt, this position had to be offered first to teachers with contracts for the upcoming year, and the high school athletic director confirmed from Karahuta that Hunt would be given a contract for the 1991–1992 school year.

In June 1991, or after the April 30 statutory deadline for providing notice, and after the April 1 contractual deadline for providing notice, Karahuta told Hunt that there was no position for her at Bassett Elementary. According to Hunt, Karahuta said that he felt she was an average teacher and he did not like her treatment of underprivileged children, and he remarked that there had been too many maternity leaves at the school. These latter remarks reportedly referenced Hunt's prior insistence at reporting suspected child abuse and her comments that she and her fiance were excited about starting a family soon after their marriage.

Hunt next testified that she subsequently spoke with the five members of the board, and a majority of them stated that she would be rehired. The board subsequently met in executive session. Hunt admitted that she left this meeting

before a final determination was reached, and she also denied receiving Dinklocker's letter dated August 12, 1991. She admitted, however, that Dinklocker advised her by telephone of the board's action and that a copy of Dinklocker's letter was presented to her in August 1991 by a member of the WTA. In this letter the board had proposed the option of casual substitute teaching. Hunt further testified that she was never called in to substitute, but she did earn $1,000 teaching summer school. She later learned that she had more experience than six people who were hired by the district, and that long-term substitute positions were filled after the board made its decision not to renew her employment.

Hunt next testified that she was given only one observation report during her employment in 1990–1991, which is less than what is required under the collective bargaining agreement. According to Hunt, this and the timing and method by which she was informed of the board's decision not to renew her employment constituted procedural deficiencies that rendered ineffective the board's decision not to renew her contract.

On cross-examination, Hunt admitted that after the board decided not to renew her contract, she received a letter from the acting superintendent of the district that explained that it is the board's policy to annually nonrenew all of the long-term substitutes. In addition, Hunt acknowledged that she knew that only the board, acting at a public meeting, had hiring authority. As to the money she received in lieu of continued teaching with the board, Hunt stated that she received $7,257 from unemployment compensation and $2,000 from substitute teaching in another school district. With regard to her claim for violation of the "Sunshine" law, Hunt admitted that she left before the board ended its executive session and before a decision was reached.

On November 29, 1993, the trial court found that plaintiffs had shown no right to relief, and it dismissed plaintiffs' remaining claims, pursuant to the provisions of Civ.R. 41(B)(2). Plaintiffs now appeal, assigning eight errors for our review.

## II

Plaintiffs' first, sixth, and seventh assignments of error are interrelated and state:

"The trial court erred by (a) failing to grant summary judgment in favor of Hunt and the WTA on the breach of contract claims, (b) by failing to grant judgment at trial on said claims for appellants, (c) by granting judgment for appellees, (d) by finding that Hunt's remedy was through a statutory appeal rather than a breach of contract action, (e) by excluding relevant evidence on these issues, (f) by finding that Hunt had failed to establish her damages, and (g)

by making factual findings or conclusions of law on these issues not supported by the record."

"The trial court erred by dismissing the 'Sunshine' law claims and by finding that it had no jurisdiction to consider a statutory appeal by Hunt and/or Hunt had waived a statutory appeal."

"The trial court erred by finding that Hunt had to utilize the statutory appeal proceedings, rather than a civil action, for her breach of contract claims and/or she had waived her right to seek a remedy through a civil action."

The fundamental question which must first be addressed within these assignments of error is whether plaintiffs have invoked the proper procedures for challenging the board's determination. Defendants maintain, and the trial court concluded, that plaintiffs have invoked an improper form of relief by filing the instant action, since they were required to perfect a statutory appeal within thirty days after the proceedings before the board, pursuant to R.C. 3319.11. Conversely, plaintiffs maintain that they have invoked a proper form of relief because the collective bargaining agreement provides that it supersedes any other provisions of the Revised Code. In addition, the agreement purports to establish arbitration as the next level of dispute resolution, yet for Hunt, a teacher with less than three years' experience, arbitration was not permitted. Thus, plaintiffs maintain, this ambiguity in the procedures allows them to file a complaint against defendants in the court of common pleas in lieu of a statutory appeal. Plaintiffs further assert that their initiation of this action is proper because the board did not complete critical acts which must be completed before the time for perfecting an appeal begins to run.

In relevant part, R.C. 4117.10(A) provides:

"An agreement between a public employer and an exclusive representative entered into pursuant to this chapter governs the wages, hours, and terms and conditions of public employment covered by the agreement. If the agreement provides for a final and binding arbitration of grievances, public employers, employees, and employee organizations are subject solely to that grievance procedure and the state personnel board of review or civil service commissions have no jurisdiction to receive and determine any appeals relating to matters that were the subject of a final and binding grievance procedure. *Where no agreement exists or where an agreement makes no specification about a matter, the public employer and the public employees are subject to all applicable state or local laws or ordinances pertaining to the wages, hours, and terms and conditions for public employees.* Laws pertaining to civil rights * * * prevail over conflicting provisions of agreements between employee organizations and public employers. * * * " (Emphasis added.)

■ Thus, unless the collective bargaining agreement specifically provides to the contrary, the parties are subject to all laws pertaining to that matter. *Reeves v. Union Twp. Bd. of Trustees* (1989), 55 Ohio App.3d 148, 150, 563 N.E.2d 370, 371–372; cf. *Naylor v. Cardinal Local School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 162, 165, 630 N.E.2d 725, 728–729 (unless a collective bargaining agreement specifically provides to the contrary, R.C. 3319.111 governs the evaluation of a teacher employed under a limited contract).

The statutory law as it pertains to a school board's notice of intent not to renew a teacher's limited contract is set forth in R.C. 3319.11(E), which provides in relevant part as follows:

"[A]ny teacher employed under a limited contract, and not eligible to be considered for a continuing contract, is, at the expiration of such limited contract, considered reemployed under the provisions of this division * * * unless evaluation procedures have been complied with pursuant to division (A) of section 3319.11 of the Revised Code and the employing board, acting upon the superintendent's written recommendation that the teacher not be reemployed, gives such teacher written notice of its intention not to reemploy him on or before the thirtieth day of April. A teacher who does not have evaluation procedures applied to him in compliance with division (A) of section 3319.11 of the Revised Code *or who does not receive notice of the intention not to reemploy him on or before the thirtieth day of April is presumed to have accepted such employment* unless he notifies the board in writing to the contrary on or before the first day of June, and a written contract for the succeeding school year shall be executed accordingly." (Emphasis added.)

In *Kiel v. Green Local School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 149, 630 N.E.2d 716, the Supreme Court analyzed this provision and determined that a teacher with a limited contract is deemed reemployed unless the board "gives such teacher written notice of its intention not to reemploy him on or before the thirtieth day of April." As to the procedures which must be invoked in order to pursue a claim that notice requirements were not met, we observe that R.C. 3319.11(G) provides:

"(1) *Any teacher receiving written notice of the intention of a board of education not to reemploy him* * * * may within ten days of the date on which he received the notice, file with the treasurer of the board of education a written demand for a written statement describing the circumstances that led to the board's intention not to reemploy the teacher.

"(2) The treasurer of a board of education, on behalf of the board, shall, within ten days of the date on which he receives a written demand for a written statement * * * provide to the teacher a written statement describing the circumstances that led to the board's intention not to reemploy the teacher.

"(3) Any teacher receiving a written statement describing the circumstances that led to the board's intention not to reemploy the teacher * * * may, within five days of the date on which he received the statement, file with the treasurer of the board of education a written demand for a hearing before the board of education * * *.

"(4) The treasurer of a board of education, on behalf of the board, shall, within ten days of the date on which he receives a written demand for a hearing * * * provide to the teacher a written notice setting forth the time, date, and place of the hearing * * *.

"(5) Any hearing conducted pursuant to this division shall be conducted by a majority of the members of the board of education. The hearing shall be held in executive session of the board of education unless the board and the teacher agree to hold the hearing in public. * * *.

"(6) Within ten days of the conclusion of a hearing conducted pursuant to this division, the board of education shall issue to the teacher a written decision containing an order * * * the intention of the board not to reemploy the teacher * * *.

"(7) *A teacher may appeal an order affirming the intention of the board not to reemploy the teacher* to the court of common pleas of the county in which the largest portion of the territory of the school district is located, *within thirty days of the date on which the teacher receives the written decision* * * *." (Emphasis added.)

In this instance, the parties' initial dispute focused upon whether Hunt, as a long-term substitute, was part of the bargaining unit under the 1989–1991 collective bargaining agreement. There is no reference to long-term substitute teachers in the agreement but, pursuant to the Recognition Clause of the agreement, all certificated personnel are represented, and Hunt was certificated. With regard to pursuing a claim of improper nonrenewal, the agreement provides that for employees in the bargaining unit with three years of service or more within the district, the procedural requirements regarding nonrenewal and evaluation are subject to the grievance procedure. Further, as to the procedures on nonrenewal, the agreement indicates in a provision directed to "teachers who have more than three years of service in the district" that the designated procedure "supersedes any other provisions of this agreement or the Ohio Revised Code regarding non-renewal procedures." A provision directed to "teachers on limited contracts" contains no such language, however.

The undisputed evidence presented in this matter demonstrated that Hunt, a teacher on a limited contract with less than three years of service in the district, was challenging various procedures and board action taken in connection

with the decision to nonrenew her employment. Accordingly, it is clear that there is no contractual procedure which supersedes the provisions of the Revised Code, and the provisions of R.C. 3319.11 therefore apply, pursuant to the directives of R.C. 4117.10(A).

Accordingly, plaintiffs were required to appeal the decision of the board under the procedures outlined in R.C. 3319.11(G)(7). Plaintiffs could not simply challenge the board's nonrenewal in an original action in the court of common pleas.

With regard to plaintiffs' claim that the board did not properly notify Hunt of its final decision, and the time within which to perfect an appeal has not therefore began to run, we initially note that R.C. Chapter 3319 is remedial legislation which must be construed liberally in favor of teachers. *Kiel v. Green Local School Dist. Bd. of Edn., supra,* 69 Ohio St.3d at 149–150, 630 N.E.2d at 717. We further note that pursuant to R.C. 3319.11(G)(7), a teacher may appeal the final "order" of the board, "affirming" the previous decision to nonrenew, within thirty days of the date on which the teacher receives the written decision. From this statute, it is clear that deficiencies in providing notice of the board's intention would not alter the essential character of the remedy to be employed and would not authorize the initiation of an original action in the court of common pleas, but would extend the time within which to commence an appeal. See R.C. 3319.11(G)(7).

In this instance, the evidence indicated that Hunt did not directly receive Dinklocker's letter, but instead received a copy of it from the WTA. In addition, there was evidence that the letter was written by Dinklocker in her capacity as acting superintendent, without being directed to do so by the board, and that there was no "order" which affirmed or vacated the previous decision, no formal decision by the board, and no manifestation of the board's intention that Hunt's employment not be continued. Accordingly, there was no evidence that Hunt ever received final notice of the board's ultimate decision, and the trial court's determination that plaintiffs were required to commence their statutory appeal within thirty days of Hunt's awareness of Dinklocker's letter is therefore unsupported by the manifest weight of the evidence.

Defendants assert, however, that since the board offered Hunt the opportunity to perform casual or as-needed substitute teaching, it fully remedied its failure to provide her with notice of its decision not to renew her employment by April 30. See *State ex rel. Dennis v. Hillsdale Local School Dist.* (1988), 39 Ohio St.3d 158, 161, 529 N.E.2d 1248, 1250–1251. We note that the court explained that in its previous decision in *State ex rel. Dennis v. Hillsdale Local School Dist.* (1986), 28 Ohio St.3d 263, 503 N.E.2d 748, the court did not intend

" * * * to overlook the mandate of the General Assembly contained in the first paragraph of R.C. 3319.10 that:

" 'Teachers may be employed as substitute teachers for terms not to exceed one year for assignment *as services are needed* to take the place of regular teachers * * *; *such assignment to be subject to termination when such services are no longer needed.*' (Emphasis added.)

" * * * The language contained in the writ ordering that appellant be employed under the substitute teaching contract as his services were needed clearly follows the language used in *State ex rel. Dennis, supra,* and in the first paragraph of R.C. 3319.10. Appellant became entitled to a contract as a *substitute teacher* under *State ex rel. Dennis, supra,* but was not entitled to a contract as a regular teacher. It is a basic premise that substitute teachers are employed as their services are needed. It would be illogical to compel a school board to employ a substitute teacher whose services are not needed." 39 Ohio St.3d at 161, 529 N.E.2d at 1250.

In this instance, however, there was evidence that the board hired long-term substitutes after nonrenewing Hunt's employment; the undisputed evidence established that Hunt was never contacted by defendants to perform casual substitute teaching; and the parties stipulated that the school system had utilized eighty-four substitute teachers. Accordingly, this court is unable to conclude that defendants did legitimately and in good faith actually employ Hunt as a casual substitute teacher.

Plaintiffs' first and seventh assignments of error are well taken.

■ With regard to plaintiffs' sixth assignment of error, in which plaintiffs contend that defendants violated the "Sunshine" law in connection with their actions herein, we note that plaintiffs were required to establish that defendants violated the provisions of R.C. 3319.11(G)(5). Pursuant to this statute, any hearing on the board's decision must be held before a majority of the board, acting in executive session, unless the board and teacher agree to hold the hearing in public. This hearing envisions more than an informal session between the school board and the teacher where the teacher makes a verbal presentation protesting nonrenewal of his or her contract. *Naylor v. Cardinal Local School Dist. Bd. of Edn., supra,* 69 Ohio St.3d at 168, 630 N.E.2d at 730–731. It necessarily includes the presentation of evidence, confrontation and examination of witnesses and the review of the arguments of the parties. *Id.*

Herein, plaintiffs' evidence established that the board allowed Hunt to relate the substance of her complaint in an executive session. However, from Dinklocker's testimony regarding the fact that no evidence was presented, no questions asked, no discussions held, and no formal decisions made, this meeting hardly

qualifies as a hearing pursuant to *Naylor v. Cardinal Local. School Dist. Bd. of Edn., supra.* The trial court therefore erroneously determined that no procedural error occurred in connection with the board's "hearing," and that plaintiffs demonstrated no right to relief under this cause of action. Thus, the trial court erroneously granted a judgment of dismissal in favor of defendants.

Accordingly, plaintiffs' sixth assignment of error is well taken.

In accordance with the foregoing, we conclude that the board failed to give Hunt proper notice of its intention not to reemploy her, failed to hold a proper statutory hearing, and failed to give Hunt proper notice of any ultimate decision by the board. Thus, by application of the Supreme Court's recent pronouncements in *Kiel v. Green Local School Dist. Bd. of Edn., supra,* Hunt must be deemed reemployed. Therefore, we reverse the judgment of the lower court as to the assignments of error set forth above, and we order that the board reinstate Hunt and award her all compensation and benefits which she has lost as a result of the unlawful nonrenewal of her contract. Further, in light of this determination, plaintiffs' remaining assignments of error are moot, and we will not address them. App.R. 12(A).

*Judgment accordingly.*

DYKE, J., concurs.

KRUPANSKY, P.J., dissents.

KRUPANSKY, Presiding Judge, dissenting.

I respectfully dissent from the majority opinion since the majority has failed to demonstrate that appellants were unable to comply with the statutory appeal procedure mandated by R.C. 3319.11(G)(7).

R.C. 3319.11(G)(7) states in relevant part as follows:

"A teacher may appeal an order affirming the intention of the board not to reemploy the teacher to the court of common pleas * * * within thirty days of the date on which the teacher receives the written decision * * *. *No appeal of an order of a board may be made except as specified in this division.*" (Emphasis added.)

In the case *sub judice*, it was undisputed that Hunt failed to file an appeal from the order of the board which order affirmed the board's original intention to nonrenew Hunt's limited employment contract. On the contrary, Hunt, upon receiving written notice of the board's order, chose instead to commence the case *sub judice* as an original action, rather than an appeal, in the common pleas court.

In accordance with R.C. 3319.11(G)(7), *supra*, the common pleas court lacked subject matter jurisdiction to adjudicate Hunt's claims which arose from R.C.

3319.11 and, therefore, properly dismissed such claims. In this conclusion, I am in full agreement with the majority who write as follows:

"Accordingly, plaintiffs *were required to appeal* the decision of the board under the procedures outlined in R.C. 3319.11(G)(7). *Plaintiffs could not simply challenge the board's nonrenewal in an original action in the court of common pleas.*" (Emphasis added.)

The majority and I, however, henceforth part company.

Although the majority correctly asserts that Hunt was required to appeal from the order of the board rather than commence an original action, the majority cryptically finds that Hunt never received "final notice" of the board's "ultimate decision." Since Hunt never received final notice, the majority concludes that the statutory time in which Hunt was required to file a notice of appeal was never commenced and, presumably, has even now not begun to run. The evidence contained in the record before this appellate court, however, belies this conclusion.

In the majority, the majority states in relevant part as follows:

"In this instance, the evidence indicated that Hunt did not *directly* receive Dinklocker's letter, but instead received a copy of it from the WTA."

The majority, thus, hints that whatever notice was, in fact, provided was deficient because the notice was not sent *directly* to Hunt. The majority, however, fails to consider the circumstances under which the within notification occurred.

It was undisputed that on or about August 12, 1991, the board met in executive session and affirmed its intention not to renew Hunt's limited employment contract. Hunt, in her deposition, admitted that Acting Superintendent Christina M. Dinklocker thereafter mailed written notification of the board's order to Hunt who failed to receive the notice since she had moved from her former place of residence. Hunt also stated, however, that she obtained a copy of Dinklocker's written notification from Hunt's union representative at some point in August 1991.

In her deposition at pp. 151–152, Hunt answered questions as follows:

"Q. At that point in time did you know that you were not coming back for the following school year?

"A. I believe it was the end of August, and I still did not know then definitely whether I was coming back or not. I believe it was after the Board hearing, but there was still the possibility that I was coming back.

"Q. And that's because you said that you did not receive the letter from Dr. Dinklocker that you produced. * * *

"Q. This is document 15 in Exhibit A. Is this the letter you claim you never received?

"A. Yes.

"Q. Okay. *It's addressed to your address on Harold Avenue. That's the address that you moved from August 1st?*

"A. *Yes.*

"Q. All right. Did you have a mail forwarding order on that address to forward to Elyria?

"A. Yes.

"Q. *Did you later acquire a copy of this letter from some source?*

"A. *Yes.*

"Q. And where did you get a copy of it?

"A. Either Pat Walsh or Lynn Heitzman.

"Q. *How long after August 12 of '91 did you get a copy of that?*

"A. Was this letter mailed on August 12th?

"Q. *It was dated August 12th. How long after that date do you think you got it?*

"A. *At least a week.*

"Q. *Sometime in August?*

"A. *Yeah, I think.* I'm not sure, because I never did receive it, and I did call and ask where it was.

"Q. *And you ultimately got it from somebody at the WTA?*

"A. *Yes.*

"Q. *Had they received a copy of it?*

"A. *I believe so.*" (Emphasis added.)

Based upon the foregoing colloquy, it is obvious that Dinklocker, on August 12, 1991, timely mailed written notification of the board's order to Hunt. At deposition, Hunt identified the letter sent by Dinklocker to Hunt's former address which letter was postmarked August 12, 1991. Since Hunt, however, had moved her place of residence, Hunt did not receive the written notification.

In light of these facts, it cannot be said that Dinklocker failed to "directly" notify Hunt of the board's order. Under the foregoing circumstances, Dinklocker did all that could have been expected of her, *viz.,* she mailed Hunt written notification of the board's order at Hunt's last known address.

Therefore, the majority's analysis in the case *sub judice* with respect to *direct* notification is fatally flawed.

The majority in its opinion also states, however, as follows:

"In addition, there was evidence that the letter was written by Dinklocker in her capacity as acting superintendent, without being directed to do so by the board, and that there was no 'order' which affirmed or vacated the previous decision, no formal decision by the board, and no manifestation of the board's intention that Hunt's employment not be continued."

The majority thus concludes that R.C. 3319.11(G)(6) required only the *board* rather than Dinklocker to issue written notification to Hunt of the board's order affirming its original intention to nonrenew Hunt's employment contract and, therefore, the board failed to comply with the foregoing statutory mandate. In addition, the majority infers that Dinklocker's letter to Hunt failed to provide actual notice to Hunt of the board's order. Once again, however, the evidence contained in the instant record belies these conclusions.

It is first noted that the instant record contains no copy of Dinklocker's letter to Hunt. However, Hunt, in her foregoing deposition statements, clearly implied that once she received a copy of Dinklocker's letter, Hunt understood that the board had failed to order a reversal of its original intention to nonrenew her contract. In fact, Dinklocker stated at deposition that Hunt called Dinklocker after Hunt received the copy of Dinklocker's letter to discuss the ramifications of the letter.

Dinklocker stated in her deposition at p. 94 in relevant part as follows:

"During the conversation that Frances [Hunt] and I had after the Board meeting in which the letter was sent indicating that she would have the opportunity to serve as a day-to-day casual sub. [*sic*] *Frances, as I mentioned, did call and ask for clarification of that, at which point I gave the clarification as described, and she indicated to me her displeasure with that decision, that it was unacceptable.*" (Emphasis added.)

In addition, Hunt stated in her original complaint in relevant part as follows:

"19. Despite the above-described representations, the Board on or about August 12, 1991, *finalized its decision and refused to re-employ Plaintiff as a full-time and/or as long-term substitute teacher for the 1991–1992 school year.*" (Emphasis added.)

Based upon the foregoing evidence, it is clear that Hunt, upon receiving a copy of Dinklocker's letter, understood that the board affirmed its earlier intention to nonrenew her contract.

Moreover, Hunt has not alleged on appeal that upon receiving a copy of Dinklocker's letter Hunt still failed to understand that the board affirmed its earlier intention not to renew her contract. Restated, although Hunt claimed throughout the instant litigation that she received no notification prior to April 30, 1991 of the board's *intention to nonrenew her contract,* Hunt never claimed she failed to receive notification of the board's August 12, 1991 *order affirming its intention* not to renew her contract.

Therefore, the majority's conclusion that Dinklocker's letter failed to notify Hunt of the board's order to affirm its earlier intention to nonrenew Hunt's employment is not substantiated by the evidence contained in the within record and is also fatally flawed.

Furthermore and most importantly, the majority, in the foregoing statement from the majority opinion, suggests that since Dinklocker rather than the board itself notified Hunt, the notification was not in conformity with R.C. 3319.11(G)(6), *supra.* The majority, however, ignores the numerous deposition statements of Dr. Mary Spor who was a member of the Westlake Board at the relevant times herein. Of significance are the statements by Spor which demonstrate unequivocably that Dinklocker possessed actual authority to notify Hunt on behalf of the board of the board's order.

Spor's answers contained in her deposition at pp. 22–23 stated in relevant part as follows:

"Q. And whom *[sic]* ultimately made the final decision on whether an applicant was hired or not hired?

"A. The final decision was made by the Superintendent of Schools for all hirings. He makes the recommendation—or in the past has made the recommendation to the Board.

"Q. And then the Board would either take that recommendation or not take it; is that correct?

"A. Well, the Board would take that recommendation.

"Q. As a matter of course, *or you had absolutely delegated that authority to him?*

"A. *That was his authority. The screening process was conducted by the Administration, and the final recommendation came from the Superintendent.*

"Q. *Was the Superintendent's recommendation ever rejected on a hiring?*

"A. *No, it was never rejected for a certificated staff.* * * * " (Emphasis added.)

In addition, Spor's answers contained in her deposition stated at pp. 48–49, 52 in relevant part as follows:

"Q. Why did you make that determination? Why did you make the determination to go with the casual substitute, as opposed to a long-term substitute?

"A. Because the Administration did not recommend her for one of the long-term substituted positions.

"Q. Do you know why that was so?

"A. I have no idea.

"Q. But you did find out that she had not timely received the notice from the *Superintendent?*

"A. *That's right. * * ***

"Q. Why didn't you—didn't you find that to be important?

"A. It's important, but it's—*there had been times in the past when the Superintendent didn't send out notification for other things. * * ***" (Emphasis added.)

Furthermore, Spor also answered in her deposition in relevant part on pp. 61–62 as follows:

"Q. Okay. What I'm asking is when did the Board make its decision, that night after the hearing was over, the next day? When did it decide?

"A. I don't know if the Board ever made a 'decision.'

"Q. Even to this day?

"A. Well—

"Q. At least while you were still on the board?

"A. The decision that was made—if you want to call it a decision—*I believe was communicated to Miss Hunt by Dr. Dinklocker.*

"Q. Well, how did Dr. Dinklocker know what to do?

"A. She was in Executive Session with us. * * ***" (Emphasis added.)

Significantly, Spor answered in relevant part in her deposition at pp. 73–74 as follows:

"Q. So at least based upon those documents, there is no indication that the Board or the Administration ever gave written notice of non-renewal to Miss Hunt, is that what you're saying?

"A. Well, I don't see anything here.

"*The Board would not have given written notice of non-renewal, the Administration would have.*

"Q. *The Administration acts for the board?*

"A. *Right.*" (Emphasis added.)

Based upon the foregoing statements, and upon other similar statements contained in Spor's deposition not herein reproduced, it is blatantly obvious that Dinklocker was granted by the board, at the very least, *implied actual authority,* if not express actual authority, to notify Hunt on behalf of the board of the board's order affirming its intention not to renew Hunt's contract. In fact, Spor's deposition statements indicate the board delegated all notification responsibilities to the Superintendent who acted on behalf of the board as the board's agent. R.C. 3319.11(G)(6), *supra,* does not preclude the board from issuing its order *via* the board's own agent.

Thus, the majority's conclusion that "the letter was written by Dinklocker in her capacity as acting superintendent, without being directed to do so by the board" is not supported by the evidence contained in the within record and is fatally flawed.

The majority finally relies upon the principle contained in *Kiel v. Green Local School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 149, 150, 630 N.E.2d 716, 717, which states as follows:

"We have consistently held that the [Ohio Teacher Tenure] Act is remedial legislation which is to be liberally construed in favor of teachers."

Although I agree with this principle, I do not agree that the statutory appeal procedure should be arbitrarily abandoned. Furthermore, *Kiel, supra,* does not mandate such arbitrary abandonment.

In *Kiel, supra,* 69 Ohio St.3d at 153, 630 N.E.2d at 719–720, the Ohio Supreme Court deemed a teacher reemployed pursuant to R.C. 3319.11 stating in relevant part as follows:

"By mailing the notice of its intent not to renew Kiel's teaching contract to the Smithville High School, the school board did not comply with R.C. 3319.11(E). The certified return receipt is not signed by Kiel. *The board did not timely present any evidence that Kiel personally received the notice.* * * * " (Emphasis added.)

In the case *sub judice,* however, evidence contained in the within record clearly demonstrates that Hunt did, in fact, receive actual notice of the board's order affirming its earlier intention to nonrenew Hunt's contract. Hunt received a copy of the letter of notification sent by Dinklocker as agent for the board. Hunt obviously understood from the letter that the board had failed to reverse its intention to nonrenew Hunt's employment contract. Hunt thereafter telephoned Dinklocker whereby she received additional clarification of the board's order.

Hunt, subsequently, commenced the original action which is the case *sub judice*. Pursuant to R.C. 3319.11(G)(7), *supra*, however, Hunt was required to commence an appeal from the board's final order rather than an original action in order to challenge the board's compliance or noncompliance with R.C. 3319.11. The common pleas court realized that it was without subject matter jurisdiction to adjudicate Hunt's claims arising from R.C. 3319.11 and rightly dismissed such claims in the case *sub judice*.

The majority opinion also concludes that the board failed to conduct a proper hearing when it reviewed its original intention to nonrenew Hunt's contract. The majority states in relevant part as follows:

"Herein, plaintiffs' evidence established that the board allowed Hunt to relate the substance of her complaint in an executive session. However, from Dinklocker's testimony regarding the fact that no evidence was presented, no questions asked, no discussions held, and no formal decisions made, this meeting hardly qualifies as a hearing pursuant to *Naylor v. Cardinal Local School Dist. Bd. of Edn., supra.*"

In *Naylor v. Cardinal Local School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 162, 630 N.E.2d 725, the respective board of education notified the plaintiff teacher of its intention to nonrenew her employment contract. The board, thereafter, conducted a hearing in which the board *prohibited* the plaintiff from calling any witnesses to testify on her own behalf. The Ohio Supreme Court stated at 168–169, 630 N.E.2d at 730–731 in relevant part as follows:

"In our view, the requirements of R.C. 3319.11(G)(5) envision more than an informal session between a school board and the teacher, where the teacher makes a verbal presentation protesting nonrenewal of his or her contract. * * *

"Therefore, we hold that the hearing provided teachers under limited contracts by R.C. 3319.11(G)(3), (4) and (5) necessarily includes the presentation of evidence, confrontation and examination of witnesses and the review of the arguments of the parties."

*Naylor, supra*, however, is inapposite to the case *sub judice* for one very important reason, *viz.*, there is no evidence contained in the within record that the Westlake Board *prohibited* Hunt from presenting evidence or witnesses on her own behalf. The majority admits that Hunt stated her case to the board at the August 12, 1991 Executive Session. The majority opinion then finds that since Hunt refused or failed to adduce evidence before the board, the hearing is deemed to be invalid and the board was prohibited from issuing an order. Such conclusion flies in the face of logic.

The burden of proof was on Hunt to adduce evidence on her own behalf. The fact that Hunt failed to produce evidence or witnesses on her own behalf did not

prevent the board from deliberating and issuing an order. Had the board prohibited Hunt from adducing evidence on her own behalf, the hearing, pursuant to *Naylor, supra,* would have indeed been invalid. Such, however, was not the circumstance in the case *sub judice.*

Based upon the foregoing analyses, I therefore respectfully dissent from the majority decision. I would hold that the board properly conducted the Executive Session and satisfied R.C. 3319.11(G)(6), *supra,* when Dinklocker notified Hunt of the board's order affirming its original intention to nonrenew Hunt's employment contract. Furthermore, since Hunt failed to timely appeal from the board's order in accordance with R.C. 3319.11(G)(7), *supra,* I would dismiss the appeal *sub judice* for lack of subject matter jurisdiction.